Galen T. Shimoda (Utah Bar No. 18094)
Austin D. Sork (Utah Bar No. 19693)
**Shimoda & Rodriguez Law, PC**
1414 E. Murray Holladay Road
Holladay UT 84117
Telephone: (833) 201-0213
attorney@shimodalaw.com
asork@shimodalaw.com

Cary R. Burke (pro hac vice forthcoming)
Alexander Meier (pro hac vice forthcoming)
Jackie Lee (pro hac vice forthcoming)
**Lee Meier Law Firm**
695 Pylant Street NE, Suite 105
Atlanta, GA 30306
Telephone: (404) 474-7628
cburke@leemeier.law
ameier@leemeier.law
jlee@leemeier.law


Attorneys for Plaintiff Michelle Curry

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **MICHELLE CURRY,** individually and on behalf of all other similarly situated employees,<br><br>        Plaintiff,<br><br>    vs.<br><br>**OUTSOURCED ASSOCIATES & STAFFING, LLC dba NOW CFO, LLC;** and **DOES 1 to 100**, inclusive,<br><br>        Defendant. | **COMPLAINT FOR DAMAGES:**<br><br>1.  **Willful Failure to Pay Overtime, in Violation of the FLSA**<br>2.  **Retaliation, in Violation of the FLSA**<br>3.  **Breach of Contract**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Case No.<br><br>Assigned Judge<br>Referred Magistrate Judge |

Defendant NOW CFO prides itself on its purported ability to provide "immense value" to its clientele by taking a "unique approach" to its contracted work. But in reality, NOW CFO's

---

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

so-called unique approach amounts to little more than repackaged wage theft, in violation of the Fair Labor Standards Act.

To NOW CFO's credit, the company does not try to pretend that its compensation practices are lawful. Indeed, in its employment agreements, NOW CFO explicitly provides that its non-exempt consultants will only be paid for work time that is ***actually billed*** to a client, instead of all time that NOW CFO suffered, directed, or permitted them to work. In the same agreement, NOW CFO expressly acknowledges that these consultants ***are not exempt from overtime***.

This is a significant problem: NOW CFO's non-exempt consultants cannot bill clients— and therefore are not paid—for work like team meetings, performance reviews, internal trainings, planning sessions, impromptu calls to discuss client work, 1:1s, and a host of other behaviors that constitute compensable time. In other words, NOW CFO suffers, directs, or permits consultants to work this time, then doesn't pay them for it. It's their "unique approach" in action.

Plaintiff Michelle Curry's story differs from her former coworkers only in that Now CFO fired her for complaining about these unlawful compensation practices. Beginning in mid-September 2024, after not having received multiple paychecks despite performing compensable work, Ms. Curry raised concerns about NOW CFO's plainly unlawful pay scheme to the Company's Chief Human Resources Officer, as well as her supervisors in Atlanta, Georgia. Yet rather than recognizing that the Company's pay policy is obviously unlawful and fixing the harm done, NOW CFO's Chief Human Resources Officer first sought to gaslight Ms. Curry that its refusal to pay for all hours worked was appropriate. When those unconvincing (and wrong)

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

excuses failed, NOW CFO sent in Ms. Curry's then-supervisor, April Dietmer, to attempt to sweet-talk Ms. Curry into signing away her rights for pennies on the dollar by bypassing her counsel and directly attempting to coerce her into a bargain-bin settlement. After Ms. Curry rejected NOW CFO's ham-fisted attempt to settle on the cheap, NOW CFO predictably fired her in retaliation for raising concerns about the Company's obviously unlawful practices.

For these reasons, as well as those set out in more detail below, Ms. Curry brings claims for unpaid regular and overtime wages for time worked off the clock on behalf of herself and all those similarly situated consultants who worked for NOW CFO, LLC over the previous three years. Ms. Curry also seeks redress for NOW CFO's decision to retaliate against her by terminating her employment for raising concerns about unlawful practices.

## **INTRODUCTION**

1.    Plaintiff Michelle Curry ("Ms. Curry"), a resident of Georgia, is a former non-exempt consultant who worked for NOW CFO out of its Atlanta-area office until her employment was terminated on November 26, 2024.

2.    Ms. Curry brings a collective action on behalf of herself and all similarly situated individuals employed by NOW CFO as non-exempt consultants over the previous three-year period for unpaid regular and overtime wages under the Fair Labor Standards Act.

3.    Ms. Curry also seeks redress for 1) the unlawful retaliatory termination of her employment; and 2) damages and attorney's fees and costs based on NOW CFO's admitted breach of the terms of her employment agreement.

4.    On behalf of herself and all those similarly situated, Ms. Curry seeks injunctive relief, unpaid regular and overtime wages owed, as well as interest payments, liquidated damages, and attorney's fees and costs.

5.    As for her individual claims, Ms. Curry also seeks interest on unpaid wages, backpay, front pay, compensatory damages for emotional distress, and her attorney's fees and costs.

## JURISDICTION AND VENUE

6.    Ms. Curry's claims, as well as the claims of the putative collective class she represents, present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a).

7.    Upon information and belief, the Court has general personal jurisdiction over NOW CFO because it is a citizen of Utah. Ms. Curry bases this belief on NOW CFO's Founder being based in Utah, NOW CFO's status as a Utah limited liability company, and the company's representation that its headquarters are in Utah.

8.    In addition, NOW CFO derives substantial revenue from the state of Utah, is registered in Utah, and according to its business registration, may be served with process by serving a copy of the Complaint and Summons at its principal place of business located at 210 N 2100 West, Salt Lake City, Utah, 84116.

9.    This Court is a proper venue for Ms. Curry's claims, as well as the claims of all those similarly situated, under 28 U.S.C. § 1391(b)(1), as NOW CFO resides in this District and a substantial portion of the events giving rise to this litigation took place therein.

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

10.     Venue is also proper because Ms. Curry's May 22, 2023, Non-Exempt, Full-Time Consultant Employment Agreement (the "Agreement") provides that "[a]ny legal course of action arising from or related to this Agreement shall be commenced in the state or federal courts of Utah. Further, each party: (i) submits and consents to the exclusive jurisdiction and venue of the aforementioned court, (ii) waives any defense of inconvenient forum, (iii) agrees that if any action or proceeding arising out of, or related to this Agreement is brought in any other court of forum, the action shall be dismissed with prejudice and the party bringing the action shall pay the other party's legal fees and costs incurred therefrom, (iv) agrees that any action or proceeding shall be tried before a court and not before a jury." *See* Section XVII(g) of the Agreement, a true and correct copy of which is attached hereto as Exhibit A.

## <u>FACTS COMMON TO THE PUTATIVE COLLECTIVE</u>

11.     NOW CFO holds itself out as a provider of top-notch accounting, controller, consulting, and financial services at bargain-basement prices.

12.     Further to that commitment, on its website, NOW CFO promises that its client's needs "will be met at the lowest possible cost with the highest quality."

13.     Indeed, when pitching to prospective clients on his LinkedIn Page, NOW CFO's Founder, Jim Bennett, implores companies, "Let your dirty work be done, with NOW CFO!" *See* Exhibit B.

14.     Whether Mr. Bennett meant this ironically or not, it's still true: NOW CFO is only able to offer prospective clients "the lowest possible cost" because its employees are not paid for all hours worked.

15.    For context, NOW CFO contracts with businesses to provide consulting services from one or more of its employees.

16.    These consulting services are memorialized in written contracts between NOW CFO and the client.

17.    On information and belief, these written contracts contain typical terms such as projected project length, likely costs, and projected hours to be worked, as well as the assigned consultant's hourly rate.

18.    The consulting services provided by NOW CFO are purportedly tailored to fit a client's needs. Depending on the scope of work, a project could last for only a few days or weeks. Most of NOW CFO's client work, though, lasts for a period of several months.

19.    Also, depending on scope of work or the client's needs, NOW CFO may assign one or more of its employees to work on the project.

20.    NOW CFO currently maintains locations in 23 U.S. states.

21.    NOW CFO employs more than 1,000 people.

**ACCORDING TO ITS OWN WRITTEN PAY POLICY, NOW CFO'S NON-EXEMPT CONSULTANTS WILL ONLY BE PAID FOR HOURS BILLED TO A CLIENT, NOT ALL HOURS WORKED**

22.    NOW CFO classifies the vast majority of its consultants as non-exempt, overtime-eligible for purposes of the Fair Labor Standards Act.

23.    On information and belief, NOW CFO has employed hundreds of such non-exempt, overtime-eligible consultants over the past three years.

24.    NOW CFO's non-exempt consultants are paid an hourly rate and are eligible for overtime at 1.5 times their hourly rate for all hours worked over 40 in a work week.

25.     Strangely though, NOW CFO's policy is to pay consultants for "billable hours" only.  Further to this policy, NOW CFO defines billable hours as "hours worked for Employer's Client's that are billed to Client's for Employee's Services." *See* Exhibit A, Section I(d).

26.     This necessarily implies that NOW CFO does not pay its non-exempt consultants for work that is not billed to the client. And they don't.

27.     On information and belief, NOW CFO's policy as laid out in its Non-Exempt, Full-Time Consultant Employment Agreement is applied to all of its non-exempt, overtime eligible consultants.

28.     This belief is based on information gathered directly from opt-in Plaintiffs.  For example, opt-in Plaintiff Taylor Davis worked as a non-exempt consultant for NOW CFO from approximately February 2023 through June 2023. When employed by NOW CFO, Ms. Davis reviewed and signed NOW CFO's Non-Exempt, Full-Time Consultant Employment Agreement and was therefore subjected to NOW CFO's unlawful pay scheme. Ms. Davis has consented in writing to be a part of this action under 29 U.SC. 216(b). Ms. Davis's signed consent form is attached as Exhibit D.

29.     Likewise, opt-in Plaintiff Adam Swain worked as a non-exempt consultant for NOW CFO from approximately October 2021 through November 2023. Mr. Swain also was subject to NOW CFO's unlawful pay scheme and has consented in writing to be part of this action. *See* Exhibit E.

30.     The same goes for opt-in Plaintiff Essence Isaac, who worked for NOW CFO from July to September 2024. During this time, Ms. Isaac was only paid for client-billable hours,

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

rather than all hours NOW CFO suffered, directed, or permitted her to work. Ms. Isaac's consent form is attached as Exhibit F.

31.    On information and belief, NOW CFO has threatened non-exempt consultants with discipline, up to and including termination of employment, for attempting to be paid for hours that they worked that were not billed to a client.

## PLAINTIFF MICHELLE CURRY'S EMPLOYMENT IS TERMINATED FOR RAISING CONCERNS ABOUT NOW CFO'S UNLAWFUL PAY POLICY

32.    On or about May 22, 2023, NOW CFO hired Plaintiff Michelle Curry as a remote consultant.

33.    Under the terms of Ms. Curry's Employment Agreement, NOW CFO agreed to pay Ms. Curry only for all hours that she worked that were billed to a client. *See* Exhibit A, Section IV(a)(I).

34.    When hired, Ms. Curry entered NOW CFO's onboarding process, during which she was introduced to NOW CFO's business model.

35.    At the start of the onboarding process, NOW CFO installed its email application on Ms. Curry's phone so that she could receive (and review and respond to) work-related emails and messages instantly, at any time of day or night.

36.    On information and belief, NOW CFO installed its email application on the phones of all of its non-exempt, overtime-eligible consultants so that they, too, could receive (and review and respond to) work-related emails and messages instantly, at any time of day or night.

37.    During the onboarding process, Ms. Curry reviewed several presentations created by NOW CFO, which encouraged her to fill up her schedule by upselling clients.

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

38.     As part of NOW CFO's "Fill Your Schedule" initiative, Ms. Curry was directed to 1) work up and present possible solutions to client problems during sales meetings and whiteboarding sessions; 2) team up with NOW CFO's business development staff and other internal partners to come up with billable work; and 3) always look for ways to upsell the client.

39.     All of these behaviors constitute compensable work.

40.     Even so, Ms. Curry was advised that she could not bill such work time to a client.

41.     Indeed, April Dietmer, Atlanta Market President, advised Ms. Curry that only work on client projects could be billed.

42.     This is a problem because NOW CFO pays its non-exempt, overtime eligible consultants only for work that is billed to a client, as opposed to what it directs, suffers, or permits them to work.

43.     When questioned on this policy, Ms. Dietmer explained that internal brainstorming meetings wherein client projects were discussed were not to be billed.

44.     The same went for calls between business development team members and Ms. Curry regarding pending and ongoing client work: according to Ms. Dietmer, these calls were not billable and did not count as compensable work.

45.      After her training period concluded, NOW CFO began to staff Ms. Curry on various projects with different clients.

46.     Because she possessed more than twenty years of experience in accounting and financial roles, NOW CFO staffed Ms. Curry as a controller consultant.

47.     For her first project, NOW CFO staffed Ms. Curry with Hattenhauer Distributing Company, a family-owned business that operates retail gas stations.

48.    As part of this assignment, Ms. Curry performed work typical of an in-house accounting controller, including preparing and filing quarterly tax statements. Ms. Curry also interfaced with the client's team, reviewed the client's files, and performed other accounting-related work as appropriate.

49.    Only some of this work, in NOW CFO's view, was billable and was therefore payable to Ms. Curry.

50.    For example, Ms. Curry and the client team scheduled calls in advance to discuss work progress or the status of a project, among other things. Calls or meetings that were scheduled in advance were typically billed to the client.

51.    As with most lines of work, though, unscheduled calls also occurred during which project-based work would be discussed. These calls varied in duration but could last from a couple minutes to over an hour, depending on subject matter and time sensitivity.

52.    Even though Ms. Curry spoke with a client during these unscheduled calls, such unscheduled calls were not considered billable work. So, if Ms. Curry recorded these hours as billable work, those hours would be cut from the client's bill. Ms. Curry was therefore not paid for the time spent on these calls.

53.    Ms. Curry also regularly attended informal meetings with colleagues, during which client work was discussed. As an example, Ms. Curry would call or email another of NOW CFO's consultants to discuss a problem that had come up on a project. Or a consultant might reach out to Ms. Curry to discuss something they'd been working on.

54.     These calls and meetings varied in duration, depending on subject matter. Sometimes, they lasted around 15 minutes. Other times, they could last for an hour or longer. But these meetings and calls were not billable and were therefore not paid.

55.     Initially, the assignment with Hattenhauer was set to last for about six months. But due to Ms. Curry's good work and the client's needs, the engagement was extended for several months more.

56.     During the Hattenhauer assignment, Ms. Curry occasionally billed more than 40 hours per week in addition to her entirely uncompensated work outside of client-billable activity. During those weeks, Ms. Curry was paid time and one-half of her regular base wages for all hours billed over 40 in a workweek.

57.     More often than not, though, Ms. Curry billed 40 or fewer hours to the client in a given week and was therefore only paid straight time wages for billed time that she worked.

58.     Throughout the Hattenhauer project, Ms. Curry often spent at least five and up to 15 or more hours per week performing work that she was not allowed to bill to the client, and for which she was not paid.

59.     After this project concluded, Ms. Curry was assigned to work with Trinity Community Ministries, an Atlanta-based non-profit that provides transitional housing for unhoused men suffering from substance use disorders.

60.     This project was more "hands on" than the prior Hattenhauer work; Ms. Curry was asked to take over the client's accounting functions, which were in dire need of an update.

61.     As part of this work, Ms. Curry created a fulsome accounting manual for the client's benefit. Ms. Curry also helped the client review and reform its accounting practices and prepared the client's tax filings.

62.     In total, this project lasted for about six months as well.

63.     During the course of this project, as with Hattenhauer, Ms. Curry was not allowed to bill for things like impromptu emails and calls with clients, 1:1 meetings with Ms. Dietmer, calls and meetings with internal colleagues to discuss work progress, and a slew of other compensable work that was not paid.

64.     Next, Ms. Curry was assigned to work with Future Foundations Atlanta. That assignment lasted approximately three months and concluded in or around April 2024.

65.     NOW CFO's refusal to allow Ms. Curry to bill the client for internal meetings and discussions was particularly painful on this project. This is because Ms. Curry was partnered with another consultant, Deonte LNU, during the engagement with Future Foundations.

66.     Throughout the project, Ms. Curry called, emailed, and met with Deonte regarding their shared work for Future Foundations to discuss strategy, progress, pain points, and proposed next steps.

67.     NOW CFO apparently considered this clear value-add to be outside the scope of activities that could be billed to the client. For that reason, pursuant to the plain (unlawful) terms of NOW CFO's pay policy for non-exempt consultants, Ms. Curry was not paid for this work.

## MS. CURRY IS PLACED ON THE BENCH AND MISSES PAY PERIODS

68.     No assignment was immediately available after Ms. Curry's work with Future Foundations ended, so NOW CFO placed her "on the bench." This meant that Ms. Curry was expected to remain available for assignments, but she was not performing billable work.

69.     Also when on the bench, Ms. Curry was expected to (and did) attend internal team meetings, network with other consultants, meet with her business development partners and Ms. Dietmer, complete trainings, draft white papers, prepare business development materials, and perform other work activities that were not billed to a client.

70.     In other words, NOW CFO continued to suffer or permit Ms. Curry to work. But since NOW CFO simply did not bill that work to a client, she was not paid for that time.

71.     Ms. Curry remained "on the bench" for more than two weeks. Despite performing the above-described work tasks as well as others, none of that work was billed to a client, so she received no pay for an entire two-week pay period.

72.     Ms. Curry estimates that, while on the bench, she performed one to three (or more) hours of compensable work activities per day, for which she was not paid.

73.     After learning she would not receive a paycheck despite performing compensable work, Ms. Curry spoke with Ms. Dietmer to ask why she'd not been paid. Ms. Dietmer reaffirmed NOW CFO's written practice to only pay employees for hours that NOW CFO billed to a client.

74.     Ms. Curry also asked Christina Jackson, NOW CFO's Chief Human Resources Officer, about this policy. Ms. Jackson simply reiterated that NOW CFO had always worked under this scheme and did not intend to change its practices.

75.     After several weeks of internal networking and plumbing contacts to drum up work, Ms. Curry got "off the bench" and was staffed to work with two new clients: Enable Dental and the Student Athlete Foundation.

76.     These projects lasted from early July until early September 2024.

77.     During her work on these assignments, Ms. Curry occasionally billed more than 40 hours per week and was paid overtime for those hours over 40 that were billed.

78.     More often than not, though, Ms. Curry billed 40 or fewer hours in total to the clients in a given week and was therefore only paid straight time wages for billed time that she worked.

79.     Throughout these assignments, Ms. Curry spent between five and up to 15 or more hours per week performing work that she was not allowed to bill to the client, and for which she was not paid.

## MS. CURRY RETURNS TO THE BENCH, THEN IS TERMINATED FOR RAISING COMPLAINTS ABOUT NOW CFO'S UNLAWFUL PAY PRACTICES

80.     Once the Enable Dental and Student Athlete Foundation projects concluded, NOW CFO returned Ms. Curry to the bench.

81.     To avoid missing a full paycheck, as had happened earlier in the summer, Ms. Curry set about finding new work: as before, she met with Ms. Dietmer and her business development partners, reached out to her other internal and external network connections, and asked to attend outside networking events for the purpose of finding billable work.

82.     Unfortunately, Ms. Curry's efforts were in vain; she did not receive any money from NOW CFO for the time she worked over the pay period September 15, 2024, through September 30, 2024.

83.     This unfortunate pattern repeated itself over the next pay period. Ms. Curry remained on the bench and unstaffed. In spite of her best efforts – and even though NOW CFO expected and instructed her to work to get client-billable work – Ms. Curry was not paid. She did not receive a paycheck for the pay period October 1, 2024, to October 15, 2024.

84.     Ms. Curry, frustrated and confused, met with Mr. Patrick and Ms. Dietmer regarding NOW CFO's refusal to pay Ms. Curry for work performed in September and October.

85.     During the meeting, Ms. Dietmer and Mr. Patrick again confirmed that NOW CFO pays its non-exempt, hourly employees only for work that is billed to a client.

86.     Up to this point, neither Ms. Dietmer nor Mr. Patrick had provided Ms. Curry with any negative feedback regarding her work performance.

87.     Also up to this point, Ms. Curry had never received any sort of discipline from NOW CFO. Nor had she been placed on a Performance Improvement Plan.

88.     Additionally, up to this point, no mention had been made to Ms. Curry that the Atlanta office was experiencing a financial downturn or that discussions were being had about its possible closure.

89.     Because Ms. Curry had not received paychecks over consecutive pay periods even though she performed compensable work, by letter from her counsel dated November 1, 2024, Ms. Curry explained to NOW CFO that its written policy and practice of only paying non-exempt hourly employees for work billed to a client was patently unlawful under the Fair Labor Standards Act. Ms. Curry further confirmed her intention to file a lawsuit for unpaid wages, absent NOW CFO's commitment to pay Ms. Cury for all hours NOW CFO suffered or permitted her to work.

90.     Not long thereafter, on November 7, 2024, Ms. Dietmer and Mr. Patrick met with Ms. Curry to discuss the purported financial state of the Atlanta office. During this meeting, for the first time, Ms. Dietmer intimated that the Atlanta office was in the midst of an economic slowdown and that NOW CFO was considering closing its Atlanta office or consolidating operations with the Nashville office.

91.     The next day, by email to Mr. Patrick and Ms. Dietmer dated November 8, 2024, Ms. Curry expressed her desire to continue working for NOW CFO as a salaried, exempt consultant in Nashville, Tennessee.

92.     Later that day, by responding email, Mr. Patrick and Ms. Dietmer requested that Ms. Curry meet with them and NOW CFO's Chief Executive Officer, Randy Christensen, about the purported economic challenges in the Atlanta market.

93.     By responding email on the evening of November 8, 2024, Ms. Curry reiterated her desire to join up with the Nashville team and also raised concerns that she'd not been paid for yet another pay period. This was the third pay period in a row that Ms. Curry had not been paid any money at all, even though NOW CFO suffered or permitted her to perform compensable work.

94.     Mr. Patrick responded that he'd be willing to meet with Ms. Curry absent Mr. Christensen to talk about the Atlanta office and the reasons why Ms. Curry was not paid for the past three pay periods. That meeting was scheduled for Monday, November 11, 2024.

95.     For reasons that remain unclear, Mr. Patrick abruptly canceled the November 11, 2024, meeting just before it was set to take place. It was not rescheduled.

96.     The next day, on November 12, 2024, Ms. Dietmer invited Ms. Curry to a meeting, during which Ms. Dietmer admonished Ms. Curry for retaining counsel and demanding payment for unpaid wages. In Ms. Dietmer's words, Ms. Curry's demand was a "big deal" and employees could "lose their jobs." Ms. Dietmer also implored Ms. Dietmer to consider a low-ball demand and asked her what it would take to settle the anticipated claims.

97.     Ms. Curry did not respond substantively to Ms. Dietmer's request for a low-ball demand.

98.     While all this was going on, by letter dated November 22, 2024, from counsel for NOW CFO, NOW CFO purported to explain that Ms. Curry struggled with her role and foreshadowed that NOW CFO intended to terminate Ms. Curry's employment for performance issues.

99.     Then on November 26, 2024, two days before Thanksgiving, Ms. Jackson informed Ms. Curry that her employment was terminated because of purported volatility in the Atlanta market. During the termination meeting, Ms. Curry asked Ms. Jackson about working remotely from the Nashville office. Even though Ms. Curry had always worked remotely, Ms. Jackson denied Ms. Curry's request without a second thought.

100.    The next day, by email dated November 27, 2024, Ms. Jackson notified Ms. Curry that NOW CFO had incorrectly paid her throughout her employment. Indeed, when hired, NOW CFO agreed to pay Ms. Curry $62.50 per hour. Throughout her employment, though, NOW CFO only paid her $60.00 per hour.

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

101.    Because NOW CFO underpaid Ms. Curry throughout her employment, NOW CFO purported to send Ms. Curry a money order for $7,046.81 to, in Ms. Jackson's words, make things right.

102.    NOW CFO did not calculate or include interest owed on late wages when sending Ms. Curry the $7,046.81 in unpaid wages owed to her, nor did it pay her attorneys' fees and costs for curing one of the many breaches of her Agreement. *See* Ex. A, Section XVII(h)(I).

103.    Ms. Curry never agreed to any settlement relating to NOW CFO's admitted failure to pay her wages due when owing.

104.    Ms. Curry does not have records of her uncompensated time, though NOW CFO kept records of her "on the clock" time, as well as the "on the clock" time of its other non-exempt, overtime-eligible consultants.

## FLSA COLLECTIVE ACTION ALLEGATIONS

105.    Ms. Curry brings claims for unpaid overtime wages on behalf of herself and all other similarly situated non-exempt, overtime-eligible consultants of NOW CFO under 29 U.S.C. § 216(b).

106.    The proposed collective class is defined as follows:

All persons who worked as consultants (or other job positions performing similar duties) for NOW CFO and were classified as non-exempt for purposes of the FLSA at any time from three years prior to the filing of this Complaint through the entry of judgment (the "Collective").

107.    Ms. Curry has consented in writing to be a part of this action under 29 U.S.C. § 216(b). Ms. Curry's signed consent form is attached as Exhibit C.

108.    Taylor Davis, Adam Swain, and Essence Isaac, former consultants for NOW CFO who were also only paid for client billable work, have "opted-in" to Ms. Curry's lawsuit under 29 U.S.C. § 216(b) as well. The consent forms of Ms. Davis, Mr. Swain, and Ms. Isaac are attached as Exhibits D, E, and F, respectively. Along with Ms. Curry and the current opt-ins, members of the Collective are similarly situated under the FLSA because, among other things:

> a.    They held the same or materially similar positions with NOW CFO during the relevant time period;
>
> b.    NOW CFO, applying a policy and practice common to the Collective, compensated all Collective members by the hour and classified them as non-exempt from the FLSA's overtime requirements;
>
> c.    NOW CFO, applying a policy and practice common to the Collective, directed, suffered, or permitted Collective members to work off the clock; and
>
> d.    NOW CFO, applying a policy and practice common to the Collective, failed to compensate Collective members for their off the clock work at applicable minimum wage and overtime premium rates.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**WILLFUL FAILURE TO PAY OVERTIME COMPENSATION,**
**IN VIOLATION OF THE FAIR LABOR STANDARDS ACT**
**(PLEADED BY MS. CURRY ON BEHALF OF HERSELF AND**
**ALL THOSE SIMILARLY SITUATED)**

109.    Ms. Curry incorporates by reference and restates all preceding paragraphs as if fully set out herein.

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

110.    NOW CFO engaged in a widespread, centralized pattern, policy, and practice of violating the FLSA by failing to pay Ms. Curry and other collective members overtime at the rate of one and one-half times their regular rate for their off the clock hours in excess of 40 in a work week.

111.    At all relevant times, Ms. Curry and other members of the Collective were engaged in commerce within the meaning of the FLSA.

112.    The overtime provisions set forth in the FLSA apply to NOW CFO protect Ms. Curry and her fellow Collective members.

113.    The recordkeeping provisions of the FLSA apply to NOW CFO and required NOW CFO to, among other things, keep accurate records of the wages and work hours of Ms. Curry and her fellow Collective members.

114.    At all relevant times, NOW CFO was an employer engaged in commerce within the meaning of the FLSA.

115.    At all relevant times, NOW CFO employed Ms. Curry and her fellow Collective members within the meaning of the FLSA.

116.    At all relevant times, NOW CFO has had gross revenues in excess of $500,000.

117.    At all relevant times, NOW CFO has employed at least two employees.

118.    As a result of NOW CFO's willful failure to compensate Ms. Curry and her fellow Collective members at a rate of one and one-half times their regular rate for hours worked in excess of 40 in a workweek, NOW CFO violated the FLSA.

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

119.     NOW CFO willfully violated the FLSA's recordkeeping provisions by, among other things, failing to keep accurate records of the hours worked by Ms. Curry and her fellow Collective members.

120.     This conduct, as alleged, constitutes a willful violation of the FLSA. Because NOW CFO willfully violated the FLSA, a three-year statute of limitations applies.

121.     NOW CFO did not make a good faith effort to comply with the FLSA with respect to the compensation of Ms. Curry and the other Collective members.

122.     Because of NOW CFO's violations of the FLSA, Ms. Curry and the other members of the Collective are entitled to recover from NOW CFO their unpaid overtime wages for all hours worked over 40 in a workweek, an additional and equal amount in liquidated damages for NOW CFO's willful violations of the FLSA, prejudgment interest, reasonable attorney's fees, and costs of litigation.

## SECOND CAUSE OF ACTION
## RETALIATION, IN VIOLATION OF THE FAIR LABOR STANDARDS ACT
## (PLEADED BY MS. CURRY FOR HERSELF ONLY)

123.     Ms. Curry incorporates by reference and restates all preceding paragraphs as if fully set out herein.

124.     Ms. Curry is a covered employee for purposes of the FLSA.

125.     NOW CFO is a covered employer for purposes of the FLSA.

126.     During her employment with NOW CFO, Ms. Curry was never disciplined. Nor was she written-up, placed on a performance improvement plan, or otherwise counseled that her position with NOW CFO was in jeopardy because of any performance-related issues.

127.     Beginning in July 2024, Ms. Curry began to question NOW CFO's policy of only paying consultants for hours that are billed to a client.

128.     Then, in September 2024, Ms. Curry had a conversation with Ms. Jackson about NOW CFO's pay policy.

129.     Ms. Curry had additional conversations with Ms. Dietmer about this policy in September and October 2024 as well.

130.     Then, by letter from her counsel dated November 1, 2024, Ms. Curry explained to NOW CFO that its written policy and practice of only paying non-exempt hourly employees for work billed to a client was patently unlawful under the Fair Labor Standards Act. Ms. Curry further stated that she planned to file a lawsuit for unpaid wages absent a resolution.

131.     About one week later, for the first time, Ms. Dietmer and Mr. Patrick suggested that Ms. Curry's role might be eliminated entirely because of a purported downturn in the Atlanta market.

132.     Ms. Curry requested to be relocated to NOW CFO's Nashville office, which made sense because she worked remotely.

133.     That request was denied.

134.     About two weeks later, by letter dated November 22, 2024, also for the first time, NOW CFO, through counsel, suggested that Ms. Curry's performance was not meeting expectations.

135.     On November 26, 2024, two days before Thanksgiving, NOW CFO terminated Ms. Curry's employment.

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

136.     NOW CFO terminated Ms. Curry because she raised concerns about NOW CFO's unlawful pay practices and demanded compensation due to her.

137.     In other words, NOW CFO retaliated against Ms. Curry by terminating her employment for raising concerns about unpaid wages.

138.     As a direct and proximate cause of NOW CFO's unlawful retaliatory conduct, Ms. Curry has suffered and continues to suffer monetary harm, to which she is entitled to relief.

139.     As a direct and proximate cause of NOW CFO's unlawful retaliatory conduct, Ms. Curry has suffered and continues to suffer emotional distress, including loss of appetite, anxiety, loss of sleep, difficulty eating, sadness, feelings of worthlessness, and embarrassment, among other things, for which she is entitled to monetary damages and other relief, inclusive of her attorney's fees and costs of litigation.

140.     NOW CFO's retaliatory actions were willful, such that Ms. Curry is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(PLEADED BY MS. CURRY FOR HERSELF ONLY)**

141.     Ms. Curry incorporates by reference and restates all preceding paragraphs as if fully set out herein.

142.     Ms. Curry and NOW CFO entered into the Agreement at the beginning of her employment, which contains the following provision regarding consequences for breach:

The parties agree that should any party default in or be in breach of any of the covenants, agreements, or warranties herein contained, the non-defaulting parties or the non-breaching parties (or in the event litigation was commenced, the prevailing party) shall be

entitled to all costs and expenses, including reasonable and legally permissible under law attorneys' and expert witness fees (whether an action has been commenced or not), which may arise or accrue from enforcing any of the terms of this Agreement or terminating this Agreement, or in pursuing any remedy provided hereunder or by applicable law (whether before or after judgment).

143.     Pursuant to the Agreement, NOW CFO promised to pay Ms. Curry $62.50 for each hour she billed to a client. *See* Exhibit A, Section IV(a)(I).

144.     In practice, though, NOW CFO only paid Ms. Curry $60.00 for each hour she billed to a client, in plain breach of the Agreement's compensation terms.

145.     Upon termination, NOW CFO purported to pay Ms. Curry $7,046.81, which in NOW CFO's view was the difference between what Ms. Curry was actually paid and what she should have been paid under the Agreement's plain terms.

146.     NOW CFO did not calculate or include interest owed on late wages when sending Ms. Curry the $7,046.81 in unpaid wages owed to her, nor did it pay her attorneys' fees and costs for curing one of the many breaches of her Agreement.

147.     Ms. Curry is therefore entitled to her attorney's fees and costs incurred from litigating the obvious breach of the Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Curry and all members of the Collective who join this action request relief as follows:

      a.   A jury trial;

      b.   Certification of this case as a collective action pursuant to 29 U.S.C. § 216(b);

c.  An order compelling NOW CFO to produce in electronic format if available or, if not, in print, the names, employment dates, pay records, and last-known contact information of all members of the Collective and, further, authorizing Ms. Curry to send notice of this action to all similarly situated individuals, including publication of notice of the lawsuit online, by email, by text message, and by other means in a manner reasonably calculated to apprise Collective Members of their rights and provide them the ability to join the lawsuit;

d.  An order designating Ms. Curry's counsel as representatives of the Collective and their undersigned counsel as Collective counsel;

e.  An order declaring that the practices complained of herein are unlawful under the FLSA;

f.  Application of the FLSA's three-year statute of limitations commensurate with NOW CFO's willful FLSA violations;

g.  An order granting judgment in favor of Ms. Curry and the Collective, and awarding the full amount of damages and liquidated damages available;

h.  An award of prejudgment and post-judgment interest;

i.  An award of punitive damages to Ms. Curry because of NOW CFO's unlawful retaliation;

j.  An award of Ms. Curry's reasonable attorneys' fees and costs; and

k.  Such other and further relief as this Court deems just and proper.

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**

Dated: February 4, 2025                          **Shimoda & Rodriguez Law, PC**


By: _____
        Galen T. Shimoda
        Austin D. Sork
        Attorneys for Plaintiff



Dated: February 4, 2025                          **Lee Meier Law Firm**


By:  _/s/ Cary R. Burke_____
        Cary R. Burke
        Alexander Meier
        Jackie Lee
        Attorneys for Plaintiff
(e-signed by Austin Sork with permission of Cary
R. Burke on February 3, 2025)

**PLAINTIFF MICHELLE CURRY'S COMPLAINT**